**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

STEVEN TANNER,

     Plaintiff,

     v.

C.D.L. ELECTRIC COMPANY, LLC, F/K/A
C.D.L. ELECTRIC COMPANY, INC., C.D.L.
ELECTRIC AND SIGNALS, INC. AND
DALTON LYON

     Defendants.

Case No. 25-2056-EFM-BGS

**MEMORANDUM & ORDER ON**
**SECOND MOTION TO COMPEL NEUROPHYSICAL EXAMINATION**

NOW BEFORE THE COURT is Defendants' "Second Motion to Compel Neuro-psychological Examination Pursuant to Rule 35." (Doc. 72.)  For the reasons set forth below, Defendants' motion is **GRANTED in part** and **DENIED in part**.  Also before the Court is Plaintiff's motion to seal or redact (Doc. 82).  For the reasons set forth below, that motion is **DENIED**.

**FACTUAL BACKGROUND**

This is a personal injury lawsuit resulting from a motor vehicle collision occurring on February 9, 2023, in Greenwood County, Kansas.  Plaintiff contends the collision is the result of Defendants' negligence.  He also alleges claims for vicarious liability and loss of consortium. Defendants generally deny Plaintiff's allegations.

Defendants bring the present motion seeking an Order compelling Plaintiff's attendance at a neuropsychological independent medical examination ("IME") pursuant to Fed. R. Civ. P. 35.[1]

---

[1] Defendants' first motion on this issue (Doc. 58) was stricken by the Court for noncompliance with D. Kan. Rules 37.1 and 37.2.  (*See* text Order, 1/23/26, Doc. 63.)

Plaintiff does not oppose submitting to the IME itself (*see* Doc. 79, at 1)[2], but the parties disagree as to two issues regarding the examination:  1) whether audio or video recording of the IME should be prohibited; and 2) and whether raw neuropsychological test data can be shared with or disclosed to "unqualified individuals, including Plaintiff's counsel." (Doc. 72, at 1.)  These issues were the subject of the Court's pre-motion telephone conference with the parties on February 9, 2026, after which Defendants filed the present motion.

## ANALYSIS

As mentioned above, the parties disagree as to two issues regarding the IME – whether it may be recorded and with whom the resulting raw data may be shared.  Each issue will be discussed in turn.

## I.    Recording of an IME.

As to the issue of recording the IME, Defendants argue that "recording undermines test integrity and interferes with accepted professional practice." (Doc. 72, at 3.)  The issue has been addressed numerous times by courts in this District.  "The general rule...seems to be that courts will permit the presence of court reporters or recording devices only if the examinee can show good cause why the court reporter or recording device is especially necessary to the particular case." *Rowan v. Sunflower Elec. Power Corp.*, No. 15-9227-JWL-TJJ, 2016 WL 5109946, at *2 (quoting William Scott Wyatt, Richard A. Bales, The Presence of Third Parties at Rule 35 Examinations, 71 Temp. L. Rev. 103, 114 (1998)).  It has been noted that "[c]ases from this district and elsewhere yield different results" because "the Rule 35 standard, when applied to the facts of each case, produces a decision that is case-specific." *Id.*

---

[2] The Court notes that Plaintiff's brief in opposition and Defendants' reply do not comply with the page limitations of D. Kan. Rule 7.1.  The Court will not strike these filings for their noncompliance, but instructs the parties that they are required to comply with Rule 7.1, and all other relevant local rules, going forward.

In *Oxford v. Riddle*, the parties were in disagreement as to the plaintiff submitting to a Rule 35 IME with a board certified orthopedic surgeon. No. 18-1163-JWB-KGG, 2019 WL 315019, (D. Kan. Jan. 24. 2019). Therein, the plaintiff requested the court "allow either an observer to be present at the examination or for the examination to be video recorded." *Id.*, at 4. The plaintiff argued the reasons the exam needed to be recorded were "readily apparent":

> The independent medical examination is adversarial in nature. The defendant consults with a doctor of choice. The defendant unilaterally hires the doctor. The doctor meets with the plaintiff for a few minutes, conducting a cursory examination. The doctor subsequently opines that the treating physician made mistakes in the treatment or that the treatment was unnecessary. And the doctor testifies in deposition or at trial against the plaintiff.

*Id.* (citation to the plaintiff's briefing omitted). The plaintiff also noted that the doctors conducting these types of examinations are inherently biased. *Id.*

While acknowledging the plaintiff's concerns about the "the inherently adversarial nature of these examinations, the court in *Oxford* noted that the adversarial "situation occurs in every case in which a Rule 35 examination is allowed." *Id.* The court thus found that there was "nothing 'special' about the circumstances" in which that plaintiff found herself and denied the request to have the examination recorded. *Id.*

The issue was also raised in this District in *Jones v. Greyhound Lines*, No. 08-1185-MLB-DWB, 2009 WL 1650264 (D. Kan. June 12, 2009). Therein, the plaintiff argued that videotaping the IME would ensure accuracy of the questions, answers, and scope of the exam. The *Jones* court noted the plaintiff's failure to cite federal circuit or district court cases "because federal courts have not inclined to allow taping of Rule 35 examinations." *Id.*, at *6.

In holding that the plaintiff "failed to provide the Court with any special circumstances or concerns that would provide adequate justification for videotaping" the exam, the *Jones* decision cited with approval *Favale v. Roman Catholic Diocese of Bridgeport*, in which the United States District

3

Court in Connecticut was faced with a plaintiff's request to have a Rule 35 mental examination videotaped. 235 F.R.D. 553 (D. Conn. 2006). The *Favale* court held:

> Rule 35 does not address whether the examination should be recorded. See Fed.R.Civ.P. 35(a). 'Most courts analyze a request for recording in the same way that they evaluate a motion to permit the presence of an attorney.' Indeed, 'Courts have generally permitted the tape recording of examinations only where they have held that there is a right to have an attorney present at an examination, or <u>where special circumstances have been shown</u>.' Further, a recording device, like an observer, could 'constitute a <u>distraction during the examination and work to diminish the accuracy of the process</u>.'
> ...
> Further, the court finds that in this case, recording the examination would run contrary to Rule 35's purpose of providing a 'level playing field,' because the record does not show that the defendant received a tape recording of plaintiff's treatment session. Accordingly, plaintiff has not established good cause to have the examination recorded because she has not provided the court with <u>special circumstances that differentiate her case from others in which Rule 35 examinations are sought</u>.

Id., at 557 (emphasis added) (internal citations omitted); *Jones*, 2009 WL 1650264, at *7.

This District has, however, found circumstances in which it allowed an IME to be recorded. Audio recording of an IME was allowed in *Greenhorn v. Marriott Intern., Inc.*, but only upon a showing that the plaintiff enumerated legitimate concerns, supported by credible evidence, regarding the typical conduct of the psychiatrist in question during similar, prior examinations. 216 F.R.D. 649, 654 (D. Kan. 2003). Therein, the Court acknowledged the plaintiff's concerns "(and, more specifically, in light of evidence in the record suggesting that plaintiff's concerns are legitimate) about [defendant's chosen psychiatrist's] conduct during such examinations." *Id.* More specifically, plaintiff pointed to

> (… court records from other cases) establishing that [this psychiatrist] is abusive and has a 'predilection for ignoring court orders imposing conditions upon his examination of plaintiffs.' Plaintiff directs the court to cases in which [he] has been disqualified from further participation. She further contends that [the psychiatrist] is 'the most biased, defense-oriented expert currently in use by defense firms in St. Louis.'

4

*Id.*, at 652.[3]

In *Schaeffer v. Sequoyah Trading & Transp.*, a case cited by Plaintiff, Magistrate Judge Karen Humphreys granted a plaintiff's request to record an IME.  273 F.R.D. 662, 664 (D. Kan. 2011).  In that case, however, Judge Humphreys was persuaded by several unique circumstances.  First, Judge Humphreys noted defendants' concern that the plaintiff would attempt to "manipulate the examination by stalling his responses" and found that video of the examination would "provide the court with the best evidence of whether plaintiff engaged in misconduct during the examination." *Id.*  Even more persuasive, however, was the fact that counsel for both parties agreed that the plaintiff had "a lengthy history of serious mental issues that kept him institutionalized for a significant portion of his life" with evidence that he had "difficulty remembering everyday events and interactions with medical providers." *Id.*  The *Schaeffer* court also noted the plaintiff's "low average" IQ and limited reading and vocabulary skills.  *Id.*  The court thus found that video recording of the IME would "provide the best evidence of whether defendants' retained expert conducted a fair examination and will also show whether plaintiff engaged in any delay or misconduct." *Id.*

Plaintiff herein argues that similar "special circumstances" are present in the matter before the Court.

> There is ample evidence in the case of Plaintiff's headaches, light sensitivity, blurry vision, brain fog, and trouble concentrating.  All of those symptoms will make this examination more taxing on Plaintiff than on the average person.  The testing room lights may aggravate his light sensitivity.  The stress and effort of the test may cause a headache. His vision may be taxed by reading any written materials. And certainly,

---

[3] The Court did, however, deny plaintiff's request that the exam "be conducted by an independent examiner," noting that "while a defendant 'may not have an absolute right to choose its examining doctor, the defendant's choice should be respected in the absence of a valid objection.' " *Id.* (quoting *Chrissafis v. Continental Airlines, Inc.*, 1997 WL 534874, at *5 (N.D. Ill. Aug.21, 1997) (citation omitted)).

> brain fog and trouble concentrating will make the exam itself harder than it would for the average person. All these symptoms are likely to compound Plaintiff's memory issues and make it even harder for him to recount the exam to counsel.

(Doc. 79, at 9.)

Defendants reply that while Plaintiff has complained of "headaches, light sensitivity, and difficulty concentrating," there is nothing in his medical records to establish that these things "would prevent him from communicating with counsel about the examination or otherwise justify recording the IME." (Doc. 83, at 3.) Rather, Defendants argue that Plaintiff relies on mere "speculation regarding how the testing process might affect him." (*Id.*)

Simply stated, Plaintiff has not established the requisite good cause, via the existence of sufficiently special circumstances, to show that recording is necessary in this instance. *See Rowan*, 2016 WL 5109946, at *2. As Defendants argue, Plaintiff's "generalized allegations that the testing process may be difficult or uncomfortable do not constitute the 'special circumstances' necessary to justify recording a neuropsychological IME." (*Id.*)

The Court acknowledges that Plaintiff has provided evidence that he suffers from headaches, light sensitivity, and/or trouble concentrating. That stated, these reasons to request recording of the IME are largely based on *speculation* that Plaintiff "may" get a headache or that "testing room lights may aggravate his light sensitivity." (Doc. 79, at 9.) Plaintiff has provided no actual medical evidence or opinion that this *will* in fact occur or even that is *more likely than not* to occur.[4] Further, he has provided no evidence or medical opinion as to the severity of these

---

[4] As an additional matter, there is no indication by Plaintiff that he had difficulty sitting through his deposition or that it caused him headaches or that his light sensitivity was aggravated. To the contrary, in Defendants' reply brief, they indicate Plaintiff "demonstrated the ability during his deposition to recall events and details – including when doing so supported his claims." (Doc. 83, at 4.) While a portion of Plaintiff's deposition transcript was attached as an exhibit to the briefing (Doc. 80-2), the Court is unable to glean from the transcript whether Plaintiff encountered such issues. Regardless, it was not mentioned by Plaintiff in opposition to this motion. Further, Plaintiff's counsel indicated to the Court during the pre-motion telephone conference that they made no effort, or saw no reason, to record Plaintiff's examinations with his own expert(s).

symptoms should they *in fact* occur or what the resulting impact would be on the IME. Thus, the circumstances set forth by Plaintiff herein are clearly distinguishable from those existing in cases such as *Greenhorn*, *supra* (wherein credible evidence, including court orders, was offered to establish the prior bad conduct of the psychiatrist in question) or *Schaeffer, supra* (wherein objective evidence was presented as to the plaintiff's low IQ, limited reading and vocabulary skills, and history of serious mental health issues resulting in institutionalization).

In balancing the concerns of the parties, the Court finds the presence of a recording device is not justified herein. The presence of such a recording device

> may invalidate the results of the examination, as it may consciously or unconsciously influence plaintiff 'to exaggerate or diminish h[er] reactions' to the examination. *See Holland v. United States*, 182 F.R.D. 493, 496 (D.S.C.1998). Plaintiff could perceive the recording as 'critical to h[er] case and fail to respond in a forthright manner.' *Id.* The concerns of plaintiff … do not outweigh the occasion for a reasonable examination by defendant.

*Hertenstein v. Kimberly Home Health Care, Inc.*, 189 F.R.D. 620, 631 (D. Kan. 1999). The Court thus **GRANTS** this portion of Defendants' motion and Orders that recording of the IME is prohibited.

## II.    Sharing of Raw Data.

The second issue raised is that Plaintiff has asked that the raw neuropsychological testing data from the IME be directly disclosed to counsel. The Court notes that it has "broad authority" pursuant to Federal Rule of Civil Procedure 26(c) to limit or control discovery, including Rule 35 psychological examinations. *Greenhorn*, 216 F.R.D. at 653. (citing *Stoner v. New York City Ballet Co.*, 2002 WL 31875404, at * 3 (S.D. N.Y. Dec. 24, 2002)).

Defendants argue that Plaintiff's request to disclose the raw neuropsychological testing data to counsel "conflicts with professional standards, Kansas law, and established discovery practice." (Doc. 72, at 4.) They continue that interpretation of the data requires "specialized training and expertise" and that "[d]isclosure of such materials to unqualified individuals creates a substantial risk

of misinterpretation, misuse, and compromise of test validity." (*Id.*, at 5 (citations to supporting affidavit omitted).) According to Defendants, the "disclosure of raw data directly to Plaintiff's counsel is neither necessary nor appropriate" and doing so "offers no meaningful discovery value while simultaneously creating significant and irreversible risks to test security, validity, and future reliability." (*Id.*, at 5 (citations to supporting affidavit omitted).)

Defendants also point to Kansas statutory and regulatory law, which they contend "strictly regulates the disclosure of raw psychological test materials." (*Id.*) The Court acknowledges that pursuant to K.S.A. 74-5324(a)(9), a psychologist's license may be suspended, revoked, or restricted for "unprofessional conduct." Such "unprofessional conduct" is defined to include "releasing raw test results or raw data either to persons who are not qualified by virtue of education, training, or supervision to use that information" or "allowing, endorsing, or supporting persons who are not qualified by virtue of education, training, or supervision to administer or interpret psychological assessment techniques." K.A.R. 102-1-10a(j)(6), (j)(7). Thus, Defendants argue that this raw psychological test data "may not ethically or legally be disclosed to unqualified individuals, including attorneys who lack specialized neuropsychological training." (Doc. 72, at 5.)

This issue of disclosing such raw testing data was also addressed in *Greenhorn*, *supra*, albeit under less restrictive means. Therein, the plaintiff asked the court to "limit the disclosure of plaintiff's test results" from a licensed psychiatrist "to the lawyers in this case and to preclude anyone from disseminating those results to defendants." 216 F.R.D. at 653. The court agreed to limit disclosure "to the attorneys and experts in this case until further court order." *Id.*, at 654 (citing *Lahr v. Fulbright & Jaworski, L.L.P.*, 164 F.R.D. 196, 202 (N.D. Tex. 1995)). Thus, in that case, neither party asked the Court to prohibit disclosure of the information to counsel.

8

In fact, the Court's research did not find District of Kansas cases that addressed the specific issue of disclosing raw data from a Rule 35 neuropsychological examination directly to counsel. Further, neither party herein has cited any District of Kansas cases that directly address the issue.[5]

That stated, other District Courts in the Tenth Circuit have analyzed this issue on a broader scale. In *Wright v. Hobby Lobby Stores, Inc.*, a Magistrate Judge from the District of Colorado rejected the argument that the data should not be disclosed to counsel and held that

> Defendant's desire to produce the raw data only to a 'board certified neuropsychologist' does not work in the litigation context. Plaintiff may or may not hire her own expert neuropsychologist, but that does not mean that Plaintiff's counsel should not be entitled to review the raw test data, potentially for use in cross examination of Defendant's expert. Lawyers without formal medical or other specialized training are known to consult learned treatises or textbooks to educate themselves about special areas of expertise for the purpose of cross-examination. Under the Rules, Plaintiff's counsel should have access to the raw test data. **The raw data is no more sensitive than an individual's personal medical records, private financial documents, or confidential corporate trade secrets, all of which is routinely exchanged in lawsuits through use of a court-ordered protective order. The Court finds no reason why a protective order cannot safeguard the exchange of confidential test data in this case**.

344 F. R.D. 538, 542 (D. Colo. 2023) (emphasis added).

The District of New Mexico faced this issue in *Sellars v. Foldy*, No. 08-1097-MCA-RLP, 2009 WL 10706752 (D. N.M. Nov. 24, 2009). Therein, the Magistrate Judge noted the American Psychological Association's Ethical Principles of Psychologists and Code of Conduct "prohibit production of test materials to anyone not a psychologist or neuropsychologist." *Id.*, at *1 (citing *Taylor v. Erna*, No. 08-10534-DPW, 2009 WL 2425839 (D. Mass. 2009)). While the *Sellars* court recognized the "tension between the disclosure requirements of F. R. Civ. P. 26 and the APA ethical

---

[5] The Court does not find Defendants' reliance on *State v. Hamilton*, 435 P.3d 597 (Kan. Ct. App. 2019), an unpublished opinion from the Kansas Court of Appeals to be instructive. 2019 WL 986302 (Kan. Ct. App. March 1, 2019). As Plaintiff explains, the *Hamilton* decision is distinguishable because it is "based on the breadth of reciprocal discovery in criminal cases permissible under Kansas law." (Doc. 79, at 11.)

guidelines," that court ordered disclosure of the raw data and noted that this "ethical dilemma … is resolved by the issuance of a court order compelling production." *Id.*, at *2 (citing APA Ethical Standard 9.11 (other citations omitted)).

Defendants argue that both of these cases are distinguishable.[6]  Defendants dispute the *Wright* court's assertion that this raw data "is no more sensitive than an individual's personal medical records, private financial documents, or confidential corporate trade secrets," which are routinely covered by court-ordered protective orders.  (Doc. 72, at 7.)  Without saying how the *Sellars* decision is distinguishable, Defendants simply reference that the opinion addresses the "tension between the disclosure requirements of F. R. Civ. P. 26 and the APA ethical guidelines," while concluding "that the ethical dilemma could be addressed through the issuance of a court order compelling production."  (*Id.*)

In the context of *Wright* and *Sellars*, Defendants' expert, Dr. Paul, opines that "neuropsychological testing materials are fundamentally different from ordinary confidential records" and that disclosure thereof to unqualified individuals "creates significant and irreversible risks to test security, scientific validity, and reliability – and these risks are not mitigated by the existence of a court order or protective order.  (*Id.*, at 7-8 (citing to Doc. 72-1, at ¶¶ 23-31).)  While Defendants (and their expert Dr. Paul) may *disagree* with the legal conclusions in *Wright* and *Sellars*, they have not actually *distinguished* the present situation from the circumstances presented by either of those cases.

---

[6] Defendants also argue that as decisions from other Districts, *Wright* and *Sellars* "are neither controlling nor persuasive authority in this District."  (Doc. 72, at 7.)  Defendants have overstated this concept, however, because a District Court is free to find reasoning from opinions from other courts to be persuasive or "to be influenced by an accumulation of authority."  *Accord School Employees Credit Union v. National Union Fire Ins. Co.*, 839 F. Supp. 1447, 1480 (D. Kan. 1993) (citation omitted) (in context of cases from other courts of appeals).  Given the lack of case law from the District of Kansas, the Court finds the analysis contained in these two decisions to be persuasive and applicable to the issues presented.

The Court, however, finds both cases to be relevant and persuasive. The *Wright* decision is particularly applicable as it comes in the context of a neuropsychological IME that was to be conducted on a plaintiff in a personal injury case, which is clearly analogous to the present situation. While the facts in *Sellars* are sparse, the opinion relates to the disclosure of the raw testing data generated by the defendant's psychological expert. Regardless, the undersigned Magistrate Judge finds the legal analysis of the courts of the District of Colorado and the District of New Mexico to be more persuasive than the legal conclusions of Plaintiff's medical expert.

The raw testing data at issue, which the Court finds akin to an individual's personal medical records, can be adequately safeguarded by an applicable protective order. Further, disclosure of the raw testing data in accordance with an applicable court order accords with the very APA Ethics Code relied upon by Defendants. Section 9.04 of that Code specifically provides: "[p]ursuant to a client/patient release, psychologists provide test data to the client/patient or other persons identified in the release" and "[i]n the absence of a client/patient release, **psychologists must provide test data as required by law or court order**." (Emphasis added.)

As such, the Court finds that the raw neuropsychological data from the IME should be disclosed to counsel in this case.[7] Due to the alleged sensitivity of the information, the Court instructs Defendant to produce this information marked as "attorneys eyes only." This portion of Defendants' motion is, therefore, **DENIED**.

### III.    Motion to Seal or Redact.

---

[7] Defendants also assert that their expert Dr. Paul has "confirmed that he would be ethically unable to conduct the examination if recording were permitted." (Doc. 72, at 4 (citing Doc. 72-1, at ¶ 14).) While acknowledging that this might cause difficulty for Defendants, the Court's legal analysis cannot be based upon or influenced by the personal decisions of one particular health care professional.

Also before the Court is Plaintiff's motion to seal (Doc. 82) exhibits 1, 3, 4, 5, 6, and 7 (Docs. 80-1, 80-3, 80-4, 80-5, 80-6, and 80-7) to Plaintiff's response in opposition to Defendants' second motion to compel. The motion is brought pursuant to D. Kan. Rule 5.4.2.

Upon inspection by this Court, these exhibits at issue exclusively include Plaintiff's medical records. Plaintiff moves the Court to seal these exhibits because they contain "personal medical information, that is not relevant ECF 80 or the issues in the case." (Doc. 82, at 1.) Plaintiff notes that his response to Defendant's motion to compel includes citations to evidence of Plaintiff's cognitive deficits stemming from the car crash that is the subject of this suit in the form of medical records that he argues contain "additional information, such as prescription medications, detailed test results, medical history, and demographics, that are not pertinent to the issues before the Court." (Doc. 82, at 1.) Plaintiff argues that the public has no "valid interest in access to Plaintiff's private medical information that has no relevance to the issues before the Court." (Id.) He also references the "recognized privacy interest in private health information, codified by Congress." (Id., at 2.)

Federal courts "recognize a general right to inspect and copy public records and documents, including judicial records and documents." *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 597 (1978). Further, "the court's inherent supervisory authority over its own files and records" provides authority to seal documents before it. *United States v. Pickard*, 733 F.3d 1297, 1300 (10th Cir. 2013). As the party seeking to seal the documents, Plaintiff must articulate "a real and substantial interest that justifies depriving the public of access to the records that inform our decision-making process." *Williams v. FedEx Corp. Servs.*, 849 F.3d 889, 905 (10th Cir. 2017) (citation omitted). While the Court notes that Defendants have not opposed Plaintiff's motion, the Court must still address the issue of sealing on the substantive merits.

Plaintiff has failed to establish in his motion to seal any substantial interest in depriving the public access to the records at issue.  Rather, Plaintiff merely argues that because the documents are his medical records, they should be sealed from public view.  (Doc. 82.)

Where the central claim in a case involves medical issues and/or injuries, accompanying medical records are central to the claim and this court has denied motions to seal such documents. *See e.g. Chadwell v. United States*, No. 20-1372-JWB, 2024 WL 4298677, at *1-2 (D. Kan. Sept. 26, 2024) ("[T]hese medical records are central to the claims.  In such cases, this court has denied motions to seal . . .").

THEREFORE, Plaintiff's motion to seal exhibits 1, 3, 4, 5, 6, and 7 (Doc. 82) is **DENIED**. The Court notes that personal identifying information has been appropriately redacted from these documents pursuant to Fed. R. Civ. P. 5.2(a).  The clerk's office is directed to unseal all documents at docket entries 80-1, 80-3, 80-4, 80-5, 80-6, and 80-7.

## CONCLUSION

IT IS HEREBY ORDERED that Defendants' Motion (Doc. 72) is **GRANTED in part** and **DENIED in part** as set forth herein.  Plaintiff is to attend a Rule 35 neuropsychological examination. Any video or audio recording of this IME is prohibited.  Further, the raw neuropsychological data from the IME is to be disclosed to counsel for Plaintiff and Defendants who have entered their appearance in this case.

IT IS FURTHER ORDERED that Plaintiff's Motion to Seal (Doc. 82) is **DENIED**.

IT IS SO ORDERED.

Dated March 20, 2026, at Wichita, Kansas.

/s/BROOKS G. SEVERSON
Brooks G. Severson
United States Magistrate Judge

13